CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
10/24/2017
JULIA C. DUDLEY, CLERK
BY: s/ JODY TURNER
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| O'SULLIVAN FILMS, | ) |
| Plaintiff, | ) Case No. 5:17-CV-00031 |
| v. | ) |
| DAVID NEAVES, | ) By: Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter comes before the court on defendant's Motion to Dismiss, ECF No. 8, in which defendant requests that the court dismiss plaintiff's Complaint for Declaratory Judgment and Injunctive Relief (the "Complaint" or "Compl."), ECF No. 1, under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim. For the reasons set forth below, the court will **DENY** the motion to dismiss.

### I. Background

Plaintiff O'Sullivan Films ("O'Sullivan") is a national manufacturer of plastic film products, including artificial leather products.[1] O'Sullivan develops and manufactures artificial leather products for multiple automotive manufacturers, including current and prospective clients General Motors, Fiat Chrysler Automobiles, Ford, Tesla, and Daimler.

---

[1] All facts herein are taken from the Complaint and the NSA. On a motion to dismiss, the court takes as true all allegations. See Cooper v. Pate, 378 U.S. 546, 546 (1964) (per curiam).

These manufacturers use O'Sullivan's artificial leather products for the fabrication of automobile interior parts and seating.

Defendant David Neaves ("Neaves") worked as New Product Development Chemist at O'Sullivan's Winchester, Virginia artificial leather plant from June 2013 through December 2016. Neaves played a central role in the development of O'Sullivan's artificial leather products and, in his position, received extensive proprietary training with O'Sullivan's parent company. Neaves had responsibility over O'Sullivan's artificial leather group, with a number of junior artificial leather research and development employees reporting to him. In his position, Neaves also worked closely with O'Sullivan's current and prospective clients.

As part of his employment with O'Sullivan, Neaves signed a Confidential Information, Invention, and Non-Solicitation Agreement (the "NSA"), ECF No. 1 Ex. 1. The NSA contained a confidential information provision, in which Neaves promised he would "only use the Confidential Information[2] for the benefit of O'Sullivan, and not for [his] own or anyone else's benefit." NSA ¶ 3. Neaves agreed that when his "employment with O'Sullivan ends regardless of the reason, [he] will return in good condition all O'Sullivan property and Confidential Information." Id. ¶ 4.

The NSA also restricted Neaves' ability to solicit certain O'Sullivan contacts. In pertinent part, Neaves agreed that:

> [f]or one year after [his] employment with O'Sullivan ends, either voluntarily or for cause, [he] agree[d] that [he] will not (a) sell, attempt to sell, or assist others in selling or providing products or services in competition with the

---
[2] The NSA defines "Confidential Information" as "any kind of information that is not known by the general public," including "technical information (such as formulas, trade secrets, inventions, and designs); financial information (such as projections, forecasts, budgets, and plans); and business and manufacturing information (such as plans, strategies, processes, competitive analyses, and lists and information about customers, potential customers, vendors, and employees)." NSA ¶ 1.

>Business of O'Sullivan at the Restricted Contacts; or (b) help, financially or otherwise, any person or entity to compete with the Business of O'Sullivan by using or contacting the Restricted Contacts.

Id. ¶ 8. In turn, "Restricted Contacts" is defined as:

>"actual and potential customers, agents, distributors, vendors, business partners, and persons or entities that, during the two years before [Neaves'] employment with O'Sullivan ends, [he] had direct contact with or that [he] had indirect contact with, including indirect contact by supporting or being responsible for the activities of other O'Sullivan employees who had direct contact with the Restricted Accounts."

Id. Finally, Neaves agreed that, during his employment with O'Sullivan and for two years after his employment ended, he would inform any potential future employer of the contents of the NSA. Id. ¶ 11.

Neaves resigned on December 12, 2016, telling O'Sullivan that he had accepted a position as Director of Research and Development with Uniroyal Global Engineering, Inc. ("Uniroyal"). Uniroyal, which also develops and manufactures artificial leather products, is a direct competitor of O'Sullivan and provides products to many of O'Sullivan's current and potential clients. In conversations with O'Sullivan management as he was planning his resignation, Neaves claimed he did not know the contents of the NSA. Additionally, shortly after Neaves left O'Sullivan, a forensic examination of Neaves' company-issued laptop indicated that Neaves transferred certain proprietary O'Sullivan documents to a personal USB flash drive, which Neaves did not return upon his resignation.

On March 30, 2017, O'Sullivan commenced this action. O'Sullivan's Complaint seeks a declaration that Neaves is violating the terms of the NSA and injunctive relief against future violations of the NSA. The court, concerned that O'Sullivan had not properly pled subject matter jurisdiction in the Complaint, issued an show cause Order why the case

3

should not be dismissed for lack of jurisdiction. Order, ECF No. 5. O'Sullivan's Memorandum in Response to the Court's Show Cause Order, ECF No. 7, pled additional jurisdictional facts. In further support of the court's jurisdiction over its claim, O'Sullivan also included the Declaration of Richard J. Till (the "Till Declaration" or "Till Decl."), ECF No. 7 Ex. A, who is Vice President of Human Resources for O'Sullivan. The same day, Neaves moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim.

## II. Jurisdiction

Neaves first moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Federal courts are courts of limited jurisdiction. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005); United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009). A federal court's jurisdiction is confined to the cases that, within the bounds of the Constitution, Congress has allowed the court to hear. See Bowles v. Russell, 551 U.S. 205, 212 (2007). If a federal court determines it lacks subject matter jurisdiction over a complaint, "the action must be dismissed." Vuyyuru, 555 F.3d at 347. The party seeking to invoke a federal court's jurisdiction bears the burden of demonstrating that subject matter jurisdiction actually exists. Shore Bank v. Harvard, 934 F. Supp. 2d 827, 832 (E.D. Va. 2013).

### A. Declaratory Judgment Act Standards

Declaratory actions in federal court are governed by the Declaratory Judgment Act, which provides that "[i]n a case of actual controversy within its jurisdiction," a court "may declare the rights and other legal relations of any interested party seeking such declaration."

28 U.S.C. § 2201(a). The court may exercise jurisdiction over a declaratory action only when "(1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 592 (4th Cir. 2004) (internal quotations and citations omitted). Neaves contests the first and second criteria.

### B. Actual Controversy

The first Volvo Construction criterion requires a plaintiff to demonstrate the existence of "a controversy that qualifies as an actual controversy under Article III of the Constitution." Id. In other words, a plaintiff must have constitutional standing to sue. Shore Bank, 934 F. Supp. 2d at 837. The Fourth Circuit has identified three components of constitutional standing: "(1) the plaintiff must allege that he or she suffered an actual or threatened injury that is not conjectural or hypothetical, (2) the injury must be fairly traceable to the challenged conduct; and (3) a favorable decision must be likely to redress the injury." Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

A declaratory action must also be ripe—that is, the "controversy is presented in 'clean-cut and concrete form.'" Id. at 319 (quoting Rescue Army v. Mun. Court of L.A., 331 U.S. 549, 584 (1947)). In the Fourth Circuit, to determine if a case is ripe, a court must "balance 'the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" Franks v. Ross, 313 F.3d 184, 194 (4th Cir. 2002)

5

(quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998)). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." Miller, 462 F.3d at 319. The hardship prong considers the immediacy of the threat. Id. Nonetheless, a declaratory action "may be ripe even though future contingencies may determine whether a controversy becomes real." United Nat. Ins. Co. v. Horton Sales Dev. Corp., No. 1:11cv28, 2011 WL 4714337, at *2 (W.D.N.C. Sept. 15, 2011). Despite the seemingly different requirements of standing and ripeness, the Fourth Circuit has explained that "[a]nalyzing ripeness is similar to determining whether a party has standing." Miller, 462 F.3d at 319 (citing Erwin Chemerinsky, Federal Jurisdiction § 2.4 (4th ed. 2003)).

A review of the relevant case law supports O'Sullivan's position that a declaratory action is proper vehicle for adjudication of the enforceability of a restrictive covenant, as long as an employer has sought or indicated that it will seek to enforce that covenant. Compare, e.g., Domtar AI Inc. v. J.D. Irving, Ltd., 43 F. Supp. 3d 635, 639–40 (E.D.N.C. 2014) (declaratory judgment appropriate where former employer sought to enforce restrictive covenant), and Wellness Grp., LLC v. King Bio, Inc., No. 1:12-CV-00281-MR-DLH, 2014 WL 1713767, at *4–5 (W.D.N.C. April 30, 2014) ("The fact that [plaintiff] has refrained from engaging in any conduct which could violate the terms of the [restrictive covenant] and subject [plaintiff] to such a penalty does not minimize the nature of the controversy between the parties."), with Klosek v. Am. Express Co., 370 F. App'x 761, 763–64 (8th Cir. 2010) (per curiam) (affirming dismissal of declaratory action on restrictive covenant where plaintiffs did "not allege that [the company] intends to enforce the

6

noncompete clauses" and "only expressed a hypothetical desire to compete with [the company] in the future"), and Fei Guan v. Bing Ran, 1:17cv332 (JCC/IDD), 2017 WL 2881363, at *6 (E.D. Va. July 6, 2017) (determining declaratory action not appropriate where company had "no intention" of enforcing restrictive covenants and "would be more than happy to oblige Plaintiff's potential desire to seek employment elsewhere").

Here, it is clear that O'Sullivan seeks to enforce the NSA, as O'Sullivan is actively currently prosecuting this case. The court agrees with the weight of the case law and finds that the current dispute over the NSA is an "actual controversy" under Article III of the Constitution and the Declaratory Judgment Act. Under the particular set of facts in front of it, the court finds that the Complaint properly alleges that O'Sullivan is facing or will face imminent harm from Neaves' alleged breach of the NSA. A favorable decision is likely to redress the injury by prohibiting Neaves from continuing to breach the NSA and causing further injury to O'Sullivan. This is sufficient to establish standing and ripeness.

With the case law supporting the court's finding that there is a justiciable controversy, Neaves nonetheless insists that there is no controversy based on the Complaint's purported lack of "evidence" that O'Sullivan "is suffering any harm, loss of business, or other 'injury in fact' sufficient to invoke" jurisdiction. Mot. Dismiss, ECF No. 8, at 5. Instead, Neaves complains that O'Sullivan is "merely speculating" that Neaves' new position will cause a breach of the NSA. Id. In particular, Neaves insists that O'Sullivan "has failed to allege that [Neaves] has actually solicited its customers; caused it any harm; disclosed its confidential information; or taken any action in violation of his agreement." Id.

Neaves' interpretation of the Complaint misses the mark. The allegations in the Complaint certainly suggest that Neaves is now working for a direct competitor of O'Sullivan, threatening a breach of the NSA. The Declaratory Judgment Act does not require O'Sullivan to sit on its hands until actual damages crystallize from Neaves' alleged breach.

In any event, the Complaint does adequately allege crystallized injury to O'Sullivan caused by the alleged breach. The court is allowed to make reasonable inferences from factual content plead in the Complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). And a plaintiff is generally allowed to plead facts based on "information and belief" if it is unable to ascertain the existence of those facts with certainty because evidence of those facts is controlled by a defendant. See Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) ("The Twombly plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged upon "information and belief" where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible." (internal citations omitted)); Ridenour v. Multi-Color Corp., 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) (same).

The Complaint alleges, upon information and belief, that Neaves is both (1) using confidential information belonging to O'Sullivan, and (2) selling products and services in competition with O'Sullivan, for the benefit of Uniroyal, from which, if true, the court could reasonably infer a breach of Paragraphs 3 and 7 of the NSA. Compl. ¶¶ 33–34; NSA ¶¶ 3 &

8

7. The Complaint alleges that Neaves transferred "certain proprietary O'Sullivan documents to a personal USB drive" and failed to return the USB drive to O'Sullivan, from which, if true, the court could reasonably infer a breach of Paragraph 4 of the NSA. Compl. ¶ 32; NSA ¶ 4. The Complaint alleges that Neaves failed to advise Uniroyal of the NSA, from which, if true, the court could reasonably infer a breach of Paragraph 11 of the NSA. Compl. ¶ 31; NSA ¶ 11. These allegations are sufficient for the court to find that there is a justiciable controversy between the parties, and the first Volvo Construction criterion is satisfied.

### C. Diversity Jurisdiction

The second Volvo Construction criterion requires the court to possess an independent basis for jurisdiction over the parties. Volvo Constr., 386 F.3d at 592. The Declaratory Judgment Act does not create an independent basis for jurisdiction. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (With the Declaratory Judgment Act, "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction."); City Nat'l Bank v. Edmisten, 681 F.2d 942, 945 n.6 (4th Cir. 1982) (The Declaratory Judgment Act "is remedial only, and is not itself a basis for federal subject matter jurisdiction."). Most commonly, a declaratory action will base jurisdiction on diversity or federal question jurisdiction.

The Complaint only pleads diversity jurisdiction. Compl. ¶ 4. As such, the court may exercise diversity jurisdiction over this action only if the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of costs. 28 U.S.C. § 1332. The court

9

finds, and the parties do not contest, that complete diversity exists.³ See Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996). Instead, Neaves claims that O'Sullivan has not properly pled the requisite amount in controversy.

The party seeking to exercise the court's jurisdiction bears the burden of demonstrating by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional threshold. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936)("[T]he court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence."); Francis v. Allstate Ins. Co., 709 F.3d 362, 369 (4th Cir. 2013) ("As the complaint in this action did not seek a specific amount in damages," the party seeking to exercise the court's jurisdiction "need only prove by a preponderance of the evidence that the amount in controversy exceeds the [jurisdictional minimum]." (alteration in original) (internal citations and quotations omitted)). The amount in controversy is determined at the time the action is commenced. Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995). In adjudicating subject-matter jurisdiction, the court is not confined to the pleadings. Instead, the court "may consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

While the amount in controversy is usually gauged by the amount pled in the complaint, in a declaratory action, "the amount in controversy is measured by the value of the object of the litigation." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 347 (1977). The Fourth Circuit has instructed courts to gauge the "value of the object of the

---

³ O'Sullivan is a Delaware corporation with its principal place of business in Virginia. Compl. ¶ 2. O'Sullivan pleads, and Neaves does not contest, that Neaves is domiciled in Wisconsin. Compl. ¶ 3; Mem. Resp. Court's Show Cause Order, ECF No. 7, at 2.

10

litigation" as the pecuniary impact of the litigation on either party.[4] See Gov't Emps. Ins. Co. v. Lally, 327 F.2d 568, 569 (4th Cir. 1964). Accordingly, the amount in controversy requirement will be satisfied if either (1) the pecuniary value of the right O'Sullivan seeks to vindicate, or (2) the cost for Neaves to comply with the injunction exceeds $75,000. Mathews v. PHH Corp., Civ. No. 3:09-CV-00083, 2010 WL 3766538, at *5 (W.D.V.A. Sept. 24, 2010). This requires the court "to look to the underlying rights and obligations of the litigants to 'calculate the potential pecuniary impact of [a] judgment to either party.'" Wood v. General Dynamics Advanced Info. Sys., Inc., No, 1:08CV624, 2009 WL 1687967, at *4 (M.D.N.C. June 17, 2009) (quoting Market Am., Inc. v. Tong, No. 1:03CV00420, 2004 WL 1618574, at *2 (M.D.N.C. July 15, 2004)).

Here, the "object" of this litigation is O'Sullivan's request for declaratory and injunctive relief; O'Sullivan seeks this relief to prevent Neaves from using his new position at Uniroyal to violate the NSA. Using the required either-viewpoint approach, there are two "objects" of this litigation from which the amount in controversy can be ascertained: (1) the amount of economic damage O'Sullivan would incur if Neaves were to violate the NSA; and (2) the economic loss Neaves would suffer if the injunction were issued. The court finds that the amount in controversy is satisfied under either method.

---

[4] At one time, it appeared that the Fourth Circuit suggested that the amount in controversy should be evaluated solely in terms of the value to the plaintiff. See Purcell v. Summers, 126 F.2d 390, 394 (4th Cir. 1942) ("It is well settled that the measure of jurisdiction in a suit for injunction is the value to plaintiff of the right which he seeks to protect."). Lally adopted the "either-viewpoint" approach, in which a court considers the impact on either party. See In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 702, 718 (D. Md. 2001) ("Although at one time the Fourth Circuit stood in the plaintiff's viewpoint camp, it appears that it would now follow the either viewpoint approach." (contrasting Purcell and Lally)). Further supporting the view that Lally implicitly abrogated Purcell, in an unpublished 1997 opinion, the Fourth Circuit confirmed that the circuit "has employed the 'either party approach,' examining the potential pecuniary effect that a judgment would have on either party to the litigation." See Liberty Mut. Fire Ins. Co. v. Hayes, No. 96-2384, 1997 WL 568673, at *3 (4th Cir. 1997) (per curiam) (applying Lally).

11

### 1. O'Sullivan's Losses

O'Sullivan, relying heavily on the Till Declaration, argues that that it earns revenue of $17 million from its business, and its financial investment in its business "is well in excess [of] $20 million." Mem. Resp. Court's Show Cause Order, ECF No. 7, at 5–6; Till Decl. ¶¶ 5–6. If Neaves were to breach the NSA, O'Sullivan estimates damages "would range anywhere from" $2 million to $7 million." Mem. Resp. Court's Show Cause Order, ECF No. 7, at 6; Till Decl. ¶ 7. Unsurprisingly, Neaves disputes these numbers. Neaves claims that O'Sullivan has not alleged "monetary damages suffered as a result of any action by Mr. Neaves, or any amount of harm it might suffer if he were allowed to continue working for Uniroyal." Mot. Dismiss, ECF No. 8, at 7.

Neaves' argument is misplaced. While O'Sullivan bears the burden of establishing the amount in controversy by a preponderance of the evidence, nothing prevents it from doing so through the use of affidavits. See Market Am., Inc. v. Tong, No. 1:03CV00420, 2004 WL 1618574, at *3–4 (M.D.N.C. July 15, 2004); McCoy v. Erie Ins. Co., 147 F. Supp. 2d 481, 493 (S.D. W.Va. 2001). It is true, as Neaves notes, that O'Sullivan's allegations are reasonably sparse on facts directly connecting Neaves' new position with the supposed $2 million to $7 million potential loss. But O'Sullivan does not need to provide more than it has already provided, especially since Neaves has proffered no competing evidence. See Tong, 2004 WL 1618574, at *4. ("Defendants have offered little additional evidence to support the contents of their affidavits. Nevertheless, in light of the fact that the affidavits are largely unrefuted by any evidence presented by Plaintiff, such affidavits are sufficient to satisfy the Defendant's burden of proof."). Instead, Neaves merely complains that the allegations and

12

the Till Declaration are speculative. This is not sufficient to defeat O'Sullivan's evidence of potential loss from a breach of the NSA. Accordingly, O'Sullivan has shown by a preponderance of the evidence that the value of the object of the litigation, as defined as the pecuniary damage it will suffer if Neaves breaches the NSA, exceeds the $75,000 jurisdictional threshold.

### 2. Defendant's Losses

O'Sullivan also contends that Neaves would lose one year's salary should the court issue the injunction that O'Sullivan requests. As Neaves' annual salary while employed at O'Sullivan was $101,059, Till Decl. ¶ 2, O'Sullivan surmises that the Neaves' annual salary at Uniroyal must be at least that much. Neaves' opposition contains a single, perfunctory response: O'Sullivan has "failed to allege any facts to show how Mr. Neaves would lose more than $75,000, should he be required to leave Uniroyal and seek employment elsewhere." Mot. Dismiss., ECF No. 8, at 7.

Neaves' argument again misses the mark. Neaves clearly had notice that O'Sullivan might argue that the proposed injunction would deprive him of more than $75,000 in income, as he attempted to stave off that argument in his Motion to Dismiss. Yet, Neaves has failed to adduce any evidence that his salary at Uniroyal is $75,000 or less.[5] Nor does he allege that he would otherwise be able to attenuate the loss of his Uniroyal salary by obtaining new employment in short order. Again, the court finds that O'Sullivan has demonstrated by a preponderance of the evidence that Neaves would stand to lose more than $75,000 should the court issue the injunction that O'Sullivan requests. The amount in

---

[5] The court notes that for his salary at Uniroyal to be $75,000 or less, he would have had to have taken a significant pay cut from his salary at O'Sullivan.

13

controversy exceeds $75,000, and the court may exercise diversity jurisdiction over O'Sullivan's case.

### III. Enforceability of the NSA

Neaves then moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Neaves argues that the NSA is "facially unenforceable under Virginia law." Mot. Dismiss, ECF No. 8. Neaves claims that NSA's geographic scope (that is, in which geographic locations the NSA prohibits Neaves from working) and functional limitations (that is, what activities the NSA bars Neaves from performing) are overbroad and therefore, unenforceable as a matter of law.

As this case sounds in diversity, the court must apply state substantive law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). The NSA provision contains a choice of law provision requiring the contract to "be governed by and interpreted according to the laws of the Commonwealth of Virginia." NSA ¶ 19. Both parties briefed this issue as if Virginia law applied. As such, this court will apply Virginia law. See Bominflot, Inc. v. The M/V HENRICH S, 465 F.3d 144, 148 (4th Cir. 2006) ("Because . . . public policy does not counsel against it, we will respect the parties' intentions and apply English law."). Further, the court is bound by interpretations of Virginia law promulgated by the Supreme Court of Virginia. Cf. California v. Freeman, 488 U.S. 1311, 1313 (1989) ("Interpretations of state law by a State's highest court are, of course, binding upon the United States Supreme Court.").

14

A restrictive covenant like the NSA is enforceable in Virginia if it "is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc., 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005). An employer seeking to enforce a restrictive covenant "bears the burden of proving each of these factors." Home Paramount Pest Control Cos., Inc. v. Shaffer, 282 Va. 412, 415, 718 S.E.2d 762, 764 (2011). In analyzing the validity of a restrictive covenant, the Supreme Court of Virginia has instructed courts to "consider the 'function, geographic scope, and duration' elements of the restriction." Id. at 416, 718 S.E.2d at 764 (quoting Simmons v. Miller, 271 Va. 561, 581, 544 S.E.2d 666, 678 (2001)).

The validity of a particular restrictive covenant "must be determined on its own facts." Assurance Data, Inc. v. Malyevac, 286 Va. 137, 144, 747 S.E.2d 804, 808 (2013) (quoting Modern Env'ts, Inc. v. Stinnett, 263 Va. 491, 493, 561 S.E.2d 694, 695 (2002)). This factual determination may not be made "in a factual vacuum," and courts must determine if a restrictive covenant is enforceable "[b]ased on the evidence presented." Id. 747 S.E.2d at 808.

With this analytical framework in mind, in Assurance Data, the Supreme Court of Virginia considered and rejected Neaves' argument that the validity of a restrictive covenant can be determined on the pleadings. Assurance Data, Inc. ("ADI") and John Malyevac ("Malyevac") entered into an agreement that, like the NSA here, contained noncompete, nonsolicitation, nondisclosure, and return of confidential information provisions. Several months later, Malyevac resigned. ADI filed a complaint alleging breaches of the

15

noncompete, nonsolicitation, nondisclosure, and return of confidential information provisions. Malyevac filed a demurrer, contending that the agreement's noncompete and nonsolicitation provisions were so broad as to be unenforceable. The trial court agreed, concluding "as a matter of law the provision is unenforceable." Id. at 142, 747 S.E.2d at 807.

The Supreme Court of Virginia reversed and remanded. The court found that "restraints on competition are neither enforceable nor unenforceable in a factual vacuum." Id. at 144, 747 S.E.2d at 808. With this in mind, the court reasoned that "[a]n employer may prove a seemingly overbroad restraint to be reasonable under the particular circumstances of the case." Id. at 144–45, 747 S.E.2d at 808. Because the trial court granted the demurrer "without permitting ADI to present evidence to demonstrate" the reasonableness of the restrictive covenant, the Supreme Court of Virginia reversed the trial court and remanded for development of the factual record. Id. at 145, 747 S.E.2d at 809.

The court agrees with O'Sullivan that Assurance Data forecloses facial attacks on restrictive covenants. As a decision from the Supreme Court of Virginia, Assurance Data is binding on the court. See Freeman, 488 U.S. at 1313. At this juncture, the court cannot determine whether the NSA is enforceable. Assurance Data requires that O'Sullivan be given the chance to present evidence that shows that the restraints in the NSA were no greater than necessary to protect its business. This in turn requires development of a factual record not available on a motion to dismiss for failure to state a claim.

16

## IV. Conclusion

O'Sullivan has established by a preponderance of the evidence that this court may exercise jurisdiction over its claims. Further, the court cannot determine on a motion to dismiss whether the NSA is impermissibly broad. Accordingly, the Motion to Dismiss, ECF No. 8, will be **DENIED**.

Entered: 10/24/2017

/s/ Michael F. Urbanski
Michael F. Urbanski
Chief United States District Judge

17