UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| O'SULLIVAN FILMS, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 5:17-cv- 00031 |
| ) | |
| DAVID NEAVES ) | |
| ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, O'Sullivan Films, Inc. ("O'Sullivan"), by counsel, and for its Amended Complaint states as follows:

## INTRODUCTION

1. By this action, O'Sullivan seeks equitable and legal remedies for David Neaves ("Neaves") breach of the Confidential Information, Invention, and Non-Solicitation Agreement (the "Agreement"), which contains post-employment restrictive covenants, and for declaratory relief in accordance with Virginia Code § 8.01-184 and 28 U.S.C. § 2201(a), that Neaves signed when employed by O'Sullivan.

## PARTIES

2. O'Sullivan is a Delaware corporation having its principle place of business within the City of Winchester, Virginia. O'Sullivan manufactures plastic film products, including artificial leather, at its Winchester plant where Neaves used to work.

3. Neaves formerly resided in Frederick County, Virginia, but now lives and works in Wisconsin.

**JURISDICTION AND VENUE**

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201(a). Venue is proper in this Court pursuant to 29 U.S.C. § 1391(b)(2).

**FACTUAL ALLEGATIONS**

5. O'Sullivan employed Neaves as its New Product Development Chemist for O'Sullivan's Artificial Leather Plant in Winchester, Virginia from June, 2013 until December, 2016. O'Sullivan markets its artificial leather products to the automotive industry for the fabrication of automobile interior parts and seating. It also markets those products to the hospitality and restaurant industries, referred to by O'Sullivan as "the fashion industry."

6. As a condition of his employment with O'Sullivan, Neaves entered into the Agreement with O'Sullivan on June 17, 2013. A true and accurate copy of the Agreement is attached to this Complaint as Exhibit 1.

7. To perform his duties and responsibilities as O'Sullivan's New Product Development Chemist, Neaves assisted in the development of O'Sullivan's competitive artificial leather products, and received extensive and unique training with O'Sullivan's parent company specifically on the formulation of artificial leather.

8. Neaves, as New Product Development Chemist, had responsibility for O'Sullivan's entire artificial leather group, and management responsibility over a number of junior artificial leather research and development employees who reported to him.

9. Neaves assisted in the development of O'Sullivan's competitive artificial leather products, and worked closely with O'Sullivan's current and prospective clients, including General Motors, Fiat Chrysler Automobiles, Ford, Tesla, and Daimler.

10. Neaves was central to O'Sullivan's research and development of new artificial leather (PVC) products for O'Sullivan's product lines.

11. Neaves, by virtue of his position and his more than three years' tenure with O'Sullivan, had access to O'Sullivan's confidential chemical formulas for its artificial leather products, its processes for creating such products, and the new chemical compounds that it had under development to compete in the marketplace.

*Neaves' Sales Role*

12. In performing his duties as New Product Development Chemist, Neaves collaborated with O'Sullivan's current and prospective clients to develop products that would best meet the client's needs for automotive seating. Neaves participated in discussions with O'Sullivan's current and prospective clients regarding their specific needs with respect to the performance of artificial leather products. Neaves assisted O'Sullivan in adapting its current products to meet the current or prospective client's performance requirements. In short, Neaves had substantial contact with O'Sullivan's current and prospective clients, and he worked intimately with them to develop new products to meet their needs.

13. For example, Neaves met with O'Sullivan client General Motors with respect to GM's specifications for its artificial leather automotive interior product, and Neaves had worked to develop a product that would meet those specifications on O'Sullivan's behalf.

14. Neaves also met with Fiat Chrysler Automobiles, Ford, Tesla, and Daimler, and those companies' tier one customers, such as Lear Corporation and Eissman Automotives, who are often the actual purchasers of O'Sullivan product on behalf of automotive customers, while performing his duties as O'Sullivan's New Product Development Chemist.

15. In the last two years of his employment with O'Sullivan, Neaves participated in the Annual Business Strategy Meeting for O'Sullivan's Automotive Group, where he had access to and participated in O'Sullivan's identification and development of its annual business strategy, including specific customer targets and products under development.

### *The Agreement*

16. Pursuant to Paragraph 1 of the Agreement, Neaves acknowledged the following definition of Confidential Information. "Confidential Information" is "any kind of information that is not known by the general public," that it includes, but is not limited to, "technical information (such as formulas, trade secrets, inventions, and designs); financial information (such as projections, forecasts, budgets, and plans); and business and manufacturing information (such as plans, strategies, processes, competitive analyses, and lists and information about customers, potential customers, vendors and employees). Ex. 1 ¶ 1.

17. Pursuant to Paragraph 2 of the Agreement, Neaves acknowledged that the business of O'Sullivan means "the development, manufacturing, marketing, and sale of plastic engineered films compounds, services related to this market, and other business that O'Sullivan engages in during my employment." Ex. 1, ¶ 2.

18. Neaves promised, pursuant to Paragraph 3 of the Agreement, "to keep secret all Confidential Information learned by" him or disclosed to him. Neaves further promised, *inter alia*, to keep the Confidential Information from the public, to use his best efforts to protect Confidential Information, only to use the Confidential Information for the benefit of O'Sullivan, and not to use Confidential Information for his own or anyone else's benefit. Neaves acknowledged that his obligations with respect to Confidential Information continued until someone other than Neaves disclosed the information to the public. He acknowledged that his

failure to protect Confidential Information would constitute a breach of the Agreement. Ex. 1, ¶ 3.

19.     Pursuant to Paragraph 4 of the Agreement, Neaves promised when his employment with O'Sullivan ended for any reason to "return in good condition all O'Sullivan property and Confidential Information …" Ex. 1, ¶ 4.

20.     Pursuant to Paragraph 6 of the Agreement, Neaves acknowledged that O'Sullivan's Confidential Information and any Derivative Works that Neaves was to create by being exposed to the Confidential Information were "very valuable to O'Sullivan." Ex. 1, ¶ 6.

21.     Pursuant to Paragraph 8 of the Agreement, Neaves also agreed that for one year after his employment with O'Sullivan ends for any reason, he would "not (a) sell, attempt to sell, or assist others in selling or providing products or services in competition with the Business of O'Sullivan at the Restricted Contacts; or (b) help, financially or otherwise, any person or entity to compete with the Business of O'Sullivan by using or contacting the Restricted Contacts." "Restricted Contacts" is defined in the Agreement as "actual and potential customers, agents, distributors, vendors, business partners, and persons or entities that, during the two years before my employment with O'Sullivan ends, I had direct contact with or that I had indirect contact with, including indirect contact by supporting or being responsible for the activities of other O'Sullivan employees who had direct contact with the Restricted Accounts." Ex. 1, ¶ 8.

22.     Pursuant to Paragraph 10 of the Agreement, Neaves agreed that he would be in violation of the Agreement if he were to engage in any of the prohibited activities directly or indirectly "as an employee, representative, consultant, [or] agent, … of a business entity[.]" Ex. 1, ¶ 10.

23. In Paragraph 11 of the Agreement, Neaves agreed that if he was preparing to leave or had left his employment with O'Sullivan, that he would "notify any person or entity with whom I intend to work of the contents of this Agreement." Neaves further authorized O'Sullivan to provide a copy of the Agreement to any such person or entity. Ex. 1, ¶ 11.

24. In Paragraph 12 of the Agreement, Neaves agreed that in addition to any other rights and remedies available to O'Sullivan, O'Sullivan may be granted temporary or permanent injunctive relief without proof of actual damages. Neaves also agreed that he would be responsible for any attorneys' fees, costs and expenses incurred by O'Sullivan by reason of any action relating to the Agreement. Ex. 1, ¶ 12.

25. Pursuant to Paragraph 13 of the Agreement, Neaves agreed that if it is determined that he violated the Agreement, the obligations under the Agreement shall be automatically extended for a period of time equal to the time he is found to have violated the Agreement. Ex. 1, ¶ 13.

26. The Agreement designates that it shall be governed by and interpreted according to the laws of the Commonwealth of Virginia, and that Virginia state or federal courts shall have exclusive jurisdiction of any action arising out of the Agreement. Ex. 1, ¶ 19.

### *Neaves' Departure for Uniroyal, A Direct Competitor*

27. On December 12, 2016, Neaves resigned his employment with O'Sullivan and in so doing, stated that he had accepted a position as Director of Research and Development with Uniroyal Global Engineering, Inc. ("Uniroyal").

28. Uniroyal manufactures plastic film products including artificial leather, which is manufactured in its plant in Stoughton, Wisconsin. Uniroyal's corporate headquarters are located in Florida.

29. Uniroyal competes with O'Sullivan by manufacturing and marketing vinyl coated fabrics, including Naugahyde.® Uniroyal's revenue is derived approximately 50% from the automotive industry and 50% from the recreational, industrial, indoor and outdoor furnishings, hospitality and healthcare markets. Uniroyal provides product to many of the same automotive manufacturers and their business partners as O'Sullivan. See List of Global OEMs Served, Uniroyal Global Engineered Products January 2017, attached as Exhibit 2.

30. In conversations with O'Sullivan officials as he was planning his resignation, Neaves indicated that he was unaware of the Agreement or the continuing obligations that it imposed upon him beyond the end of his employment with O'Sullivan. The day after his conversation with O'Sullivan officials, Neaves visited O'Sullivan's Human Resources office and asked for a copy of the Agreement.

31. Upon information and belief, when Neaves accepted the Uniroyal employment offer, he failed to advise Uniroyal of the existence of the Agreement.

32. Shortly after Neaves' resignation from O'Sullivan, a forensic examination of the O'Sullivan laptop used by Neaves during his employment revealed that Neaves had transferred certain proprietary O'Sullivan documents to a personal USB drive, a SanDisk U3 Cruzer, serial number 0001C9703050048C. Neaves returned no flash drives to O'Sullivan upon his resignation.

33. Upon information and belief, in his role as Director of Research and Development for Uniroyal, Neaves is serving precisely the same customers that he personally served while employed with O'Sullivan, using the Confidential Information belonging to O'Sullivan for the benefit of a direct competitor.

34. Neaves is selling, attempting to sell, or assisting others in selling or providing products and services in competition with the business of O'Sullivan at the Restricted Contacts, and helping an entity to compete with the Business of O'Sullivan by using or contacting the Restricted Contacts in violation of Paragraph 8 of the Agreement.

35. On January 13, 2017, O'Sullivan sent letters to Neaves and Uniroyal explaining its position that Neaves' employment with direct competitor Uniroyal will by necessity violate the terms of Neaves' Agreement with O'Sullivan and demanding assurances that Neaves is employed in some fashion that does not violate the Agreement.

36. To date, Uniroyal has failed to respond to the letter, and Neaves through counsel insists the Agreement's restrictive covenants are unenforceable. Neaves' counsel did not dispute the applicability of the Agreement to Neaves' employment with Uniroyal.

37. Should Neaves be permitted to violate the terms of the Agreement, O'Sullivan's business shall be grievously harmed.

38. An actual and justiciable controversy exists regarding whether Neaves' employment with Uniroyal violates the Agreement and whether the Agreement's restrictive covenant is enforceable.

## COUNT I – DECLARATORY JUDGMENT

39. O'Sullivan incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

40. A judicial determination and declaration is necessary to declare whether Neaves' work as Director of Research and Development for Uniroyal is a violation of the Agreement and whether the Agreement's restrictive covenant is enforceable.

41. Specifically, a judicial determination and declaration is necessary to declare whether in fact the Agreement prohibits Neaves from working for Uniroyal because his employment necessarily comprises those activities prohibited by the Agreement namely to "sell, attempt to sell, or assist others in selling or providing products or services in competition with the Business of O'Sullivan at the Restricted Contacts; or …. help, financially or otherwise, any person or entity to compete with the Business of O'Sullivan by using or contacting the Restricted Contacts."

42. Declaratory relief will clarify the rights and obligations of the parties and is, therefore, appropriate to resolve this controversy.

43. The Federal Declaratory Judgment Act permits this Court to award other relief as necessary after declaring the parties' rights. Pursuant to the Agreement, O'Sullivan is entitled to injunctive relief should this Court declare that Neaves' employment is prohibited by the Agreement. Accordingly, this Court should declare that the Agreement is enforceable, and if the Court finds that Neaves' employment with Uniroyal violates the terms of the Agreement, then the Court should enter an order enjoining Neaves from being employed by Uniroyal in violation of the Agreement.

44. Neaves' use of O'Sullivan's Confidential Information in violation of the Agreement to allow a direct competitor to compete directly with the Restricted Contacts will result in harm that is impossible to measure at this time, making injunctive relief appropriate.

## COUNT II –BREACH OF CONTRACT

45. O'Sullivan incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

9

46. Through his employment with Uniroyal, Neaves engages in the development, marketing and sale of plastic engineered films for use in the automotive industry to clients with whom Neaves had direct contact while employed by O'Sullivan.

47. Neaves therefore is in direct violation of Paragraph 8 of the Agreement because he is engaged in " (a) sell[ing], attempt[ing] to sell, or assist[ing] others in selling or providing products or services in competition with the Business of O'Sullivan at the Restricted Contacts;" Ex. 1 ¶ 8.

48. Pursuant to Paragraph 10 of the Agreement, O'Sullivan seeks injunctive relief preventing Neaves from working for Uniroyal for a one-year period from the date of entry of a final Order in this case. Ex. 1 ¶ 10. In addition, Neaves conduct has proximately caused O'Sullivan damages in an amount that exceeds $75,000.

49. Pursuant to Paragraph 12 of this Agreement, O'Sullivan also seeks to recover its costs and fees to enforce its rights under this Agreement, anticipated to exceed $100,000. Ex. 1 ¶ 12.

## PRAYER FOR RELIEF

WHEREFORE, O'Sullivan prays for judgment from this Court as follows:

1. A declaratory judgment under 28 U.S.C. § 2201 determining and declaring that Neaves' employment with Uniroyal violates the terms of the Agreement and that the Agreement is enforceable;

2. An order barring Neaves from employment with Uniroyal for a one-year period from the date of this Court's order.

3. An award to O'Sullivan of reasonable attorneys' fees in bringing and maintaining this action.

4.	An award to O'Sullivan of any other relief that this Court deems just and appropriate.

April 13, 2018				Respectfully submitted,

						O'SULLIVAN FILMS, INC.


						By:   */s/ Joan C. McKenna*
						Joan C. McKenna (VSB No. 37812)
						Charles M. Sims (VSB No. 35845)
						Robert H. Yates, III (VSB No. 35617)
						O'HAGAN MEYER, PLLC
						411 East Franklin Street, Suite 500
						Richmond, Virginia 23219
						T: (804) 403-7100 Telephone
						jmckenna@ohaganmeyer.com
						csims@ohaganmeyer.com
						ryates@ohaganmeyer.com

						*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 13th day of April, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record in this matter.

      */s/ Joan C. McKenna*
Joan C. McKenna (VSB No. 37812)
O'HAGAN MEYER, PLLC
411 E. Franklin Street, Suite 500
Richmond, Virginia 23219
T: (804) 403-7100
F: (804) 403-7110
jmckenna@ohaganmeyer.com

*Counsel for Plaintiff O'Sullivan Films, Inc*

12