CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 19 2018

JULIA C. DUDLEY, CLERK
BY: /s/ H. Beeson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| O'SULLIVAN FILMS, INC. | ) |
| Plaintiff, | ) Case No. 5:17-cv-00031 |
| v. | ) |
| DAVID NEAVES, | ) By: Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendant. | ) |

## MEMORANDUM OPINION

When Defendant David Neaves started his employment with Plaintiff O'Sullivan Films, Inc. ("O'Sullivan"), he agreed to a limited noncompete agreement (the "Noncompete") with O'Sullivan. Neaves concedes that he has willfully violated the terms of the Noncompete, but insists that the Noncompete is invalid under Virginia law. O'Sullivan disagrees and asks the court to enforce the Noncompete.

This matter comes before the court several motions. O'Sullivan has filed a Motion for Summary Judgment (the "O'Sullivan Motion"), ECF No. 50. Neaves has filed a Motion for Summary Judgment Regarding the Enforceability of the Non-Compete (the "Neaves Enforceability Motion"), ECF No. 54, and a Motion for Summary Judgment Regarding Damages (the "Neaves Damages Motion"), ECF No. 55. For the reasons described below, the O'Sullivan Motion will be **GRANTED in part** and **DENIED in part**, the Neaves Enforceability Motion will be **DENIED**, and the Neaves Damages Motion will be **GRANTED in part and DENIED in part**.

## I. Summary Judgment Standards

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal

alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## II. Background

The facts in this case are undisputed. Plaintiff O'Sullivan Films, Inc. is a manufacturer of artificial leather, which it sells to the automotive industry, among other clients. Declaration of Richard J. Till ("Till Decl."), ECF No. 60 Ex. A, ¶ 1. O'Sullivan sells over $17 million in artificial leather products annually, and its financial investment in machinery, equipment, and trade secrets is greater than $20 million. Id. ¶¶ 5–6. O'Sullivan's automobile business is targeted to manufacturers in the United States, Mexico, and Canada. Deposition of Scott Krueger, ECF No. 60 Ex. B., at 10:2–9, 11:20.

Defendant David Neaves was hired by O'Sullivan in June 2013 and worked through December 2016. Neaves first worked as a New Product Development Chemist in Artificial

3

Leather, and then was promoted to Artificial Leather Film R&D Manager. Till Decl. ¶¶ 2–3. As a requirement of his employment with O'Sullivan, on June 17, 2013, Neaves entered into a Confidential Information, Invention, and Non-Solicitation Agreement (the "Agreement"), ECF No. 60 Ex. C, with O'Sullivan. The Agreement, including the Noncompete, is governed by Virginia law. Agreement ¶ 19.

> Paragraph 8 of the Agreement contains the Noncompete:
>
> For one year after my employment with O'Sullivan ends, either voluntarily or for cause, I agree that I will not (a) sell, attempt to sell, or assist others in selling or providing products or services in competition with the Business of O'Sullivan at the Restricted Contacts; or (b) help, financially or otherwise, any person or entity to compete with the Business of O'Sullivan by using or contacting the Restricted Contacts.

Id. ¶ 8. "Restricted Contacts" is defined as:

> actual and potential customers, agents, distributors, vendors, business partners, and persons or entities that, during the two years before my employment with O'Sullivan ends, I had direct contact with or that I had indirect contact with, including indirect contact by supporting or being responsible for the activities of other O'Sullivan employees who had direct contact with the Restricted Accounts.

Id. Additionally, the "Business of O'Sullivan" is defined as "the development, manufacturing, marketing, and sale of plastic engineered films compounds, services related to this market, and other business that O'Sullivan engages in during my employment." Id. ¶ 2.

> Further, Neaves
>
> acknowledge[d] and agree[d] that the information, including the identity and size of and the contact information at these Restricted Contacts and similar information that O'Sullivan has obtained about other actual and potential customers, agents, distributors, vendors, business partners [sic] at any time constitutes O'Sullivan's Confidential Information.

Id. ¶ 8. The Agreement defines "Confidential Information" as:

4

any kind of information that is not known by the general public. It includes all documents or items that reflect what I have done with, or thought about, the Confidential Information .... Confidential Information includes, but is not limited to, technical information (such as formulas, trade secrets, inventions, and designs); financial information (such as projections, forecasts, budgets, and plans); and business and manufacturing information (such as plans, strategies, processes, competitive analyses, and lists and information about customers, potential customers, vendors, and employees). <u>All Confidential Information is protected by this Agreement regardless of how it is learned by me or disclosed to me.</u>

Id. ¶ 1.

Finally, Paragraph 12 of the Agreement provides for both injunctive relief and fee shifting should Neaves violate any part of the Agreement:

> I agree that the remedies available at law for breach of my obligations under this Agreement may be inadequate and that O'Sullivan will need immediate relief to protect its rights under this Agreement. I agree that, in addition to any rights and remedies available to O'Sullivan at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding brought to enforce my obligations under this Agreement, without the need to prove actual damage. I agree that I will be responsible for all attorneys' fees, costs, and expenses incurred by O'Sullivan by reason of any action relating to this Agreement, and that O'Sullivan will be entitled to such additional relief that a court deems appropriate.

Id. ¶ 12.

In Neaves' various positions, he refined O'Sullivan's artificial leather. Deposition of David Neaves ("Neaves Dep."), ECF No. 60 Ex. D, 50:14–17. Neaves also had management responsibility over more junior artificial leather research and development employees. Id. 68:14–65:7. According to O'Sullivan, and not disputed by Neaves:

> Neaves had access to the chemical formulas used by O'Sullivan for its artificial leather, constantly refined O'Sullivan's artificial leather products, and performed his own testing and supervised testing of O'Sullivan's products to improve performance. Neaves Dep. 28:11–14. He made adjustments to formulations for clients, Neaves Dep. 34:20–35:4, and drafted instructions and testing plans for his subordinates. Neaves Dep. 39:8–11.

5

O'Sullivan MSJ Br. 9.

Neaves admitted that the automotive companies he worked and communicated with while at O'Sullivan included Tesla, General Motors ("GM"), and Chrysler. Neaves Dep. 59:1–5. In particular, Neaves had primary responsibility for O'Sullivan's attempt to win a GM project named P1NKAD. Id. 109:21–110:3. Additionally, Neaves, through O'Sullivan, worked as a subcontractor for Ford on certain artificial leather products. Id. 79:5–7. Under Paragraph 8 of the Agreement, Tesla, GM, Chrysler, and Ford are "Restricted Contacts" to which the Noncompete applies.

On December 12, 2016, Neaves resigned his position at O'Sullivan. O'Sullivan MSJ Br. 12. He informed O'Sullivan that he had accepted a position as Director of Research and Development with nonparty Uniroyal Global Engineering, Inc. ("Uniroyal"). Id. Uniroyal also manufactures artificial leather for the automotive industry, and, as such, is a direct competitor of O'Sullivan. Id.; Deposition O'Sullivan Films By and Through Its Designated Representative Scott Krueger ("O'Sullivan 30(b)(6) Dep."), ECF No. 60 Ex. B, at 16:15–22; Uniroyal 2017 10-K Annual Report, ECF No. 60 Ex. K. In particular, Uniroyal's two largest clients are Ford and GM. List of Global OEMs Served, Uniroyal Global Engineered Products, January 2017, ECF No. 60 Ex. J, at 1–2.

Neaves has been heavily involved in the P1NKAD project for Uniroyal—the same project for which he held primary responsibility at O'Sullivan. Def.'s Answers Pl.'s Interrogs., ECF No. 60 Ex. L, at No. 7. Moreover, an email shows that while at Uniroyal, Neaves has had contact with Christina Hicks, his contact with GM at O'Sullivan. Email from

6

D. Neaves to C. Hicks dated September 27, 2017, ECF No. 60 Ex. N. Neaves also performs some work at Uniroyal for Ford. O'Sullivan Mot. Br. 13.

### III. Enforceability of the Noncompete

The parties have filed dueling motions on the enforceability of the Noncompete. As discussed below, the court finds that the Noncompete comports with Virginia law and is fully enforceable.

### A.

In Virginia, "restrictive covenants are disfavored restraints on trade," and as such, the validity of a noncompete is a threshold question. See Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc., 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005). Whether a defendant breached a noncompete becomes moot if the noncompete is invalid and unenforceable. See Home Paramount Pest Control Cos. v. Shaffer, 282 Va. 412, 420, 718 S.E.2d 762, 766 (2011) ("Because we have found the circuit court did not err in ruling the Provision unenforceable, Home Paramount's evidence of Shaffer's actual breach was not relevant.").

The Supreme Court of Virginia has instructed courts to enforce noncompete agreements only "if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." Omniplex World Servs., 270 Va. at 249, 618 S.E.2d at 342. "[T]he employer bears the burden of proof and any ambiguities in the contract will be construed in favor of the employee." Id.

7

Nonetheless, a court cannot adjudicate the enforceability of a noncompete in a factual vacuum. Assurance Data, Inc. v. Malyevac, 286 Va. 137, 144, 747 S.E.2d 804, 808 (2013). A court should "consider the 'function, geographic scope, and duration' elements of the restriction." Home Paramount Pest Control, 282 Va. at 415–16, 718 S.E.2d at 764 (quoting Simmons v. Miller, 261 Va. 561, 581, 544 S.E.2d 666, 678 (2001)). "These elements are 'considered together' rather than 'as three separate and distinct issues.'" Id. (quoting Simmons, 261 Va. at 581, 544 S.E.2d at 678). As such, a single factor that may be otherwise unreasonable could be "reasonable as construed in light of the other two." Cantol, Inc. v. McDaniel, No. 2:06CV86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006).

The function element examines whether the noncompete "restrict[s] competition by determining whether the prohibited activity is of the same type as that actually engaged in by the former employer." Home Paramount Pest Control, 282 Va. at 416, 718 S.E.2d at 764. "[V]alid provisions prohibit 'an employee from engaging in <u>activities</u> that actually or potentially compete with the employee's former employer.'" Id. at 417, 718 S.E.2d at 765 (quoting Omniplex, 270 Va. at 249, 618 S.E.2d at 342). When a noncompete "seeks to prohibit [a] former employee[] from working for [the former employer's] competitors in any capacity, [the former employer] must prove a legitimate business interest for doing so." Id. at 417–18, 718 S.E.2d at 765.

"[T]he geographic scope of a covenant not to compete must be reasonably limited." Specialty Marketing, Inc. v. Lawrence, No. CL09000928-00, 80 Va. Cir. 214, 2010 WL 7375616, at *3 (Va. Cir. Ct. Mar. 11, 2010). Nonetheless, the absence of a geographic limitation is not fatal. See Preferred Sys. Sols., Inc. v. GP Consulting, LLC, 284 Va. 382, 394,

732 S.E.2d 676, 682 (2012) ("The lack of a specific geographic limitation is not fatal to the covenant because the noncompete clause is so narrowly drawn to this particular project and the handful of companies in direct competition with PSS."); Brainware, Inc. v. Mahan, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) ("Although the absence of a geographical limitation must be considered in evaluating whether a non-compete provision is enforceable, the lack of such a limitation does not, in itself, render the non-compete provision unenforceable."); cf. ManTech Int'l Corp. v. Analex Corp., No. CL-2008-5845, 75 Va. Cir. 354, 2009 WL 6759967, at *2 (Va. Cir. Ct. July 18, 2008) (noting that "the lack of a geographical limitation is not in itself fatal," but invalidating the noncompete because it "contains no limitations" at all); but see Strategic Res, Inc. v. Nevin, No. 1:05CV992 (JCC), 2005 WL 3143941, at *3 (E.D. Va. Nov. 23, 2005) (pre-Preferred Systems Solutions case finding that a noncompete that did not have a geographic limitation was per se unreasonable). Instead, courts "must consider together the intended function of the agreement and its duration as well as whether it contains a geographic limitation." Market*Access Int'l, Inc. v. KMD Media, LLC, 72 Va. Cir. 355, 2006 WL 3775935, at *3 (Va. Cir. Ct. Dec. 14, 2006).

B.

Neaves argues that the Noncompete fails two of the three elements in the required noncompete analysis: functional limitations and the geographic scope.[1]

---

[1] Neaves does not take issue with the Noncompete's one-year duration, nor does the court perceive any legal issues with the duration. See Preferred Sys. Sols., 284 Va. at 394, 732 S.E.2d at 681 (holding that a one year noncompete was "narrowly drawn"); TradeStaff & Co. v. Nogiec, No. CL08-1512, 77 Va. Cir. 77, 2008 WL 8201050, at *3 (Va. Cir. Ct. Sept. 4, 2008) ("Virginia courts will typically enforce covenants of up to two years . . . ."); Devnew v. Flagship Grp., Ltd., No. CH05-3173, 75 Va. Cir. 436, 2006 WL 6345732, at *7 (Va. Cir. Ct. Dec. 29, 2006) (finding a two-year term reasonable). Moreover, a shorter duration can inform the reasonableness of the geographic scope and function components of a noncompete. See Advanced Mar. Enters., Inc. v. PRC, Inc., 256 Va. 106, 119, 501 S.E.2d 148, 155–56 (1998).

9

1. **Functional Limitations**

Neaves contends that the functional limitations in the Noncompete are overbroad. In particular, Neaves argues that while he worked only as a chemist for O'Sullivan, the Noncompete "prohibits a much broader range of activities: he shall not 'sell, attempt to sell, or assist others in selling or providing products' or 'help, financially or otherwise, any person or entity to compete' with O'Sullivan." Def's. Mem. Law Supp. Mot. Summ. J. Regarding Enforceability Non-Compete ("Neaves Enforceability Mot. Br."), ECF No. 63, at 7 (quoting Agreement ¶ 8.).

Neaves mainly takes issue with the language he portrays as the second clause of the Noncompete: "help, financially or otherwise, any person or entity to compete." Id. Neaves claims that the second clause "could cover any manner of 'help'—sweeping the floors, working in the accounting department, maintaining the plant facilities, providing legal services, stocking the employee kitchen, in addition to being a chemist." Id.

Neaves would have this court apply the "janitor test": "If a clause is so broad as to prohibit work involving emptying trash for a competitor—so long as they did not work as a janitor at their prior job—then the clause is unenforceable and void as a matter of law." Id. at 8 (citing Roto-Die Co. v. Lesser, 899 F. Supp. 1515, 1520 (W.D. Va. 1995)).

Notably, however, Neaves reads out qualifying language in the Noncompete, which language reads in full:

> I will not (a) sell, attempt to sell, or assist others in selling or providing products or services in competition with the Business of O'Sullivan at the Restricted Contacts; or (b) help, financially or otherwise, any person or entity to compete with the Business of O'Sullivan by using or contacting the Restricted Contacts.

10

Agreement ¶ 8.

The only reasonable way to read part (b) is so that the phrase "by using or contacting the Restricted Contacts" modifies "help, financially or otherwise." The phrase "by using or contacting the Restricted Contacts" does not make sense if it modifies "any person or entity to compete with the Business of O'Sullivan." Consequently, the only way that Neaves could violate part (b) is by using or contacting the Restricted Contacts to help another entity compete with the Business of O'Sullivan.

This interpretation defeats Neaves' appeal to a janitor test. The court finds it difficult to imagine any scenario in which a janitor would be contacting the Restricted Contacts and trying to compete with O'Sullivan unless, as O'Sullivan aptly states, "such employment were a sham effort to obscure direct competition, which the clause would prevent." Pl.'s Mem. Opp. Def.'s Mot. Summ. J. Regarding Enforceability Non-Compete, ECF No. 67, at 10. Instead, the court holds that the Noncompete is narrowly tailored so that Neaves is only precluded from engaging in employment where he (1) works in a field that is directly competitive with O'Sullivan, and (2) furthers that employment by exploiting his relationship with O'Sullivan's clients.

Similarly, Neaves takes issue with the "assisting others" language of part (a). Like with his argument about part (b) of the Noncompete, Neaves claims that part (a) prohibits him from working in the artificial leather capacity even indirectly. Neaves Enforceability Mot. Br. 8 (quoting Home Paramount, 282 Va. at 418, 718 S.E.2d at 765). But again, Neaves reads out the qualifying language "with the Business of O'Sullivan at the Restricted Contacts." Nothing in part (a) of the Noncompete prevents Neaves from working in the artificial

leather industry—even in relation to the automobile industry—as long as his work is not related to the Restricted Contacts, which the evidence shows is limited to a select group of automobile manufacturers.

In sum, the court holds that the functional limitations in the Noncompete, tied as they are to the Restricted Contacts, are narrowly tailored to protect the legitimate business interests of O'Sullivan.

### 2. Geographic Scope

Neaves also complains about the lack of geographic scope in the Noncompete. Neaves' argument distills down to one sentence: "The lack of any geographic scope in [the Noncompete], which extends to places around the world where O'Sullivan has no legitimate business purpose in suppressing competition, renders it overbroad and unenforceable." Neaves Enforceability Mot. Br. 6.

Of course, the absence of geographic scope in the Noncompete is not dispositive. See Brainware, 808 F. Supp. 2d at 827; Preferred Sys. Sols., 284 Va. at 394, 732 S.E.2d at 682. Brainware, Inc. v. Mahan is instructive. In Brainware, the court found a noncompete that did not contain a geographic limitation was still valid. Brainware was a small company in a niche market with a global reach. The competing business at which the former employee worked was another major player in that small, niche market. The noncompete's functional limitations were narrowly tailored.

As discussed in the background section, O'Sullivan is in much the same position as was Brainware. O'Sullivan competes in a highly specialized niche market: artificial leather. Though the market is small, O'Sullivan has a global reach. Uniroyal competes with

O'Sullivan to win the same clients for the same projects. And the court has already held that the Noncompete's functional limitations are narrowly drawn to protect O'Sullivan against Neaves directly competing with O'Sullivan at the Restricted Contacts. Like in Brainware, the court holds that the lack of geographic scope is not fatal given the circumscribed scope of the functional limitation and the reasonable one-year duration.

The five cases Neaves cites do not dictate a different outcome. These cases are either distinguishable or abrogated by Preferred Systems Solutions, in which the Virginia Supreme Court held that the "lack of a specific geographic limitation" was not fatal where a noncompete was "narrowly drawn to [a] particular project and the handful of companies in direct competition with" the employer. 284 Va. at 394, 732 S.E.2d at 682. See Alston Studios, Inc. v. Lloyd V. Gress & Assocs., 492 F.2d 279, 283 (4th Cir. 1974) (pre-Preferred Systems Solutions case finding noncompete invalid because of "its limitless geographic application, and too-broad encompassment of activities in which [the employee] was not engaged"); Power Distribution, Inc. v. Emergency Power Eng'g, Inc., 569 F. Supp. 54, 58 (E.D. Va. 1983) (pre-Preferred Systems Solutions case finding lack of geographic limitation per se unreasonable); Simmons v. Miller, 261 Va. 561, 581, 544 S.E.2d 666, 678 (2011) (pre-Preferred Systems Solutions case finding noncompete invalid because of "the length duration of the restriction, the expansion of restricted functions, and the lack of geographical limitation"); New River Media Grp, Inc. v. Knighton, 245 Va. 367, 370, 429 S.E.2d 25, 26 (1993) (upholding noncompete with geographic scope limited to areas served by former employer); Blue Ridge Anesthesia & Critical Care v. Gidick, 239 Va. 369, 389 S.E.2d 467 (1990) (same).

13

## IV. Damages

Neaves' Damages Motion seeks to dismiss Count II of the Amended Complaint, which seeks damages and injunctive relief for Neaves' breach of the Noncompete. Neaves claims that Count II must be dismissed for O'Sullivan's failure to establish actual damages.

In pertinent part, Count II of the Amended Complaint provides:

> 48. Pursuant to Paragraph 10 of the Agreement, O'Sullivan seeks injunctive relief preventing Neaves from working for Uniroyal for a one-year period from the date of entry of a final Order in this case. In addition, Neaves conduct [sic] has proximately caused O'Sullivan damages in an amount that exceeds $75,000.
>
> 49. Pursuant to Paragraph 12 of this Agreement, O'Sullivan also seeks to recover its costs and fees to enforce its rights under this Agreement, anticipated to exceed $100,000.

Am. Compl. ¶¶ 48–49.

Neaves contends the record demonstrates that O'Sullivan hasn't indentified any damages arising from Neaves' breach. In particular, Neaves points to O'Sullivan's Rule 30(b)(6) deposition:

> Q: As far as loss of business, has O'Sullivan lost any money as a result of Mr. Neaves?
>
> A: As I said previously, I can't tell you that.
>
> Q: Has O'Sullivan lost any accounts to Uniroyal as a result of Mr. Neaves?
>
> A: No.

O'Sullivan 30(b)(6) Dep. 39:10–17.

As a result of this testimony, Neaves argues that O'Sullivan's "damages are speculative and limited to the costs incurred in pursuing the instant action." Def.'s Mem. Law Supp. Mot. Summ. J. Regarding Damages ("Damages Mot. Br."), ECF No. 62, at 4.

Consequently, Neaves asks the court to dismiss Count II for lack of damages. See id. Notably, however, Neaves ignores O'Sullivan's request for injunctive relief in Count II.

O'Sullivan does not deny that it is not entitled to monetary damages, other than attorney's fees. Instead, it argues that it is entitled to an injunction preventing Neaves from working for Uniroyal for one year because it "has suffered irreparable harm and has an inadequate remedy at law"—such as "when monetary damages are difficult to ascertain or are inadequate to compensate [O'Sullivan] for the injury caused by [Neaves'] breach of a restrictive covenant." Pl.'s Mem. Opp. Def.'s Mot. Summ. J. Regarding Damages, ECF No. 71, at 1.

The four-element test a plaintiff must satisfy before a permanent injunction is issued is well established. A plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

O'Sullivan establishes elements (1) and (2) via Paragraph 12 of the Agreement. Under Virginia law, it is "well-settled that parties to a contract may specify the events or pre-conditions that will trigger a party's right to recover for the other party's breach of their agreement." Ulloa v. QSP, Inc., 271 Va. 72, 79, 624 S.E.2d 43, 48 (2006). This includes monetary damages, as "[n]o statute or public policy is implicated . . . that would countervail the parties' freedom to eliminate damages as a required element of a breach of contract action." Id.; see also W. Insulation, L.P. v. Moore, 316 F. App'x 291, 297 (4th Cir. 2009).

In Paragraph 12, the parties agree that O'Sullivan would not need to prove actual damages in a breach of the Agreement, including the Noncompete. Agreement ¶ 12 (allowing a breach of contract action to proceed "without the need to prove actual damages"). The parties also agree that "temporary and permanent injunctive relief" is appropriate for a breach. Under Virginia law, these provisions of the Agreement are enforceable and satisfy elements (1) and (2). See Ulloa, 271 Va. at 79, 624 S.E.2d at 48.

Element (3), the balance of equities, weighs in favor of O'Sullivan. As the Eastern District of Virginia has recently noted in the preliminary injunction context, "[a]lthough it is undoubtedly true that subjecting [a former employee] to the restrictive covenant may impair his ability to earn a living, [the employer] has an interest in protecting its customers from diversion pending resolution of the case." Update, Inc. v. Samilow, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018). Neaves does not suggest otherwise. Finally, with respect to element (4), public policy weighs in favor of O'Sullivan. Virginia law certainly "encourage[s] the enforcement of valid non-compete agreements," id., and the court has already held that the Noncompete is valid and enforceable under Virginia law.

In sum, the court holds that the Noncompete is enforceable, Neaves has breached the Noncompete, and under the terms of the Noncompete, O'Sullivan is entitled to an injunction preventing Neaves from continued violations of the Noncompete.

The court's holdings do not, however, automatically entail enjoining Neaves from working for Uniroyal in any position. Cf. Am. Compl. ¶ 48 ("O'Sullivan seeks injunctive relief preventing Neaves from working for Uniroyal for a one-year period from the date of entry of a final Order in this case."). Presumably, there are other positions at Uniroyal that

do not compete with the Business of O'Sullivan by using the Restricted Contacts. Accordingly, the court will order the parties to confer and submit a joint proposed permanent injunction no later than fourteen days after entry of the accompanying order.

Moreover, Neaves does not contest that O'Sullivan can recover attorneys' fees under Paragraph 12's fee-shifting provision. See Damages Mot. Br. 4 ("At most, [O'Sullivan's] damages are speculative and limited to the costs incurred in pursing [sic] the instant action."). The court finds that O'Sullivan is entitled to recover its reasonable attorneys' fees and costs in this action. O'Sullivan may submit a motion for attorneys' fees and costs.

## V. Conclusion

Because the Noncompete's temporal scope, functional limitations, and geographic scope are narrowly tailored to Neaves' former position at O'Sullivan, the court holds that the Noncompete is valid under Virginia law. Moreover, Neaves does not contest he is violating the Noncompete. Nonetheless, O'Sullivan has failed to prove actual damages, and the injunctive relief sought by O'Sullivan is not narrowly tailored to the terms of the Noncompete. Accordingly, the O'Sullivan Motion will be **GRANTED in part** and **DENIED in part**, the Neaves Enforceability Motion will be **DENIED**, and the Neaves Damages Motion will be **GRANTED in part** and **DENIED in part**.

Entered: 10/18/2018

/s/ Michael F. Urbanski
Michael F. Urbanski
Chief United States District Judge